J. M. MOORE v. THE STATE OF KANSAS, *on the relation of Carrie Vernon.*

BASTARDY — *Residence of Putative Father.* If the putative father of a bastard child is a resident of this state, the mother can institute proceedings against him under our statute, even if the mother and child are residents of another state.

*Error from Wyandotte District Court.*

PROCEEDING under the bastardy act. From a judgment against the defendant, *Moore,* he appeals. The opinion states the facts.

*Hutchings & Keplinger, Buchan, Freeman & Porter,* and *Scroggs & Gibson,* for plaintiff in error.

*Hale & Fife, Van Hoorebeke & Ford,* and *M. P. Murray,* for defendant in error.

Opinion by SIMPSON, C.: This a proceeding under the bastardy act. The evidence on behalf of the state having been introduced, the defendant elected to rely on a jurisdictional question presented by the evidence for the state. This question is, whether the courts of this state have any jurisdiction

in a case where the mother and her illegitimate child are and always have been non-residents of the state of Kansas. The jury found specially as follows:

" 1. Is Carrie Vernon, the relator, a citizen of the state of Kansas? A. No.

" 2. Was the relator, Carrie Vernon, ever a citizen of the state of Kansas. A. Yes.

" 3. Was the relator, Carrie Vernon, delivered of a bastard child? A. Yes.

" 4. When was said bastard child born? A. 9 P.M. on June 1, 1889.

" 5. Where was said bastard child born? A. Carlisle, Clinton county, state of Illinois.

" 6. Was said bastard child ever a citizen of the state of Kansas? A. No.

" 7. When was said bastard child begotten? A. September 3, 1888.

" 8. Where was said bastard child begotten? A. Kansas City, Kansas.

" 9. Was the relator, Carrie Vernon, born in the state of Illinois? A. Yes.

" 10. Has the relator, Carrie Vernon, always resided in the state of Illinois, except when temporarily absent? A. No.

" 11. Where does the said relator, Carrie Vernon, now reside? A. Carlisle, Clinton county, state of Illidois.

" 12. Has said bastard child ever since its birth been a resident and citizen of the state of Illinois? A. Yes."

After the jury had returned these special findings, the defendant below made a motion to set aside the answers to questions Nos. 2 and 10, on the ground that said answers were wholly unsupported by evidence. This motion was sustained, and said answers set aside. The jurisdictional question is raised by motion to discharge the defendant, by instructions asked and refused, and by the motion for a new trial. The district court adjudged the defendant to be the father of the bastard child, and that he may be charged with its. maintenance and education, and ordered the defendant to pay into court the sum of $1,200 for that purpose, in definite sums, at stated periods.

The first question to be considered is, the object to be ac-

complished and the results to be attained by proceedings under the bastardy act of this state. These things have been the subject of some comment by this court. The act itself is a strange admixture of criminal process and civil procedure, but has been classified as a civil proceeding. The power exercised by the legislature in the passage of the act, and the proceedings to be taken under it, can be traced on the one hand to the police power of the state, and on the other as conferring personal benefits to private parties. The title to the act is somewhat suggestive of its objects and purpose. It is, "An act providing for the maintenance and support of illegitimate children."

In the case of *In re Wheeler*, 34 Kas. 96, it is said by this court that "the charge of maintenance and education, while it is in the nature of a civil obligation, and imposed in a proceeding which is essentially civil, though criminal in form, is not based upon contract, either express or implied." This means that the proceeding is strictly a statutory one, and whatever rights are created or obligations imposed are by reason of the express terms of the statute. The court also says: "It is the duty of the father to make provision for the support of his illegitimate offspring." That is, the moral obligation is made a legal duty by the words of this statute. The court proceeds:

"To compel him to assist in the maintenance of the fruit of his immoral act, and to indemnify the public against the burden of supporting the child, is the purpose of the proceeding in bastardy."

The case of *Musser v. Stewart*, 21 Ohio St. 353, is cited to support the decision. That case declares —

"That a proceeding in bastardy is not a suit to recover a sum of money owed from the defendant to the complaining party. The liability sought to be enforced is not founded upon contract, express or implied, but originates in the wrongful act of the defendant, against the consequences of which the statute is designed to protect the public."

*Ex parte Cottrell*, 13 Neb. 193, is cited, and that case says:

"The proceeding is properly a police regulation, requiring

the putative father to furnish maintenance for the support of his child, and to indemnify the public against liability for its support."

All the books abound in such expressions. It seems, therefore, that bastardy acts such as ours convert the moral obligation of the father of an illegitimate child to support it into a legal duty, enforceable in the courts. Various states prescribe different forms of procedure to enforce this duty, but in all states, so far as we have read the reports of their final tribunals, the avowed purpose of these acts is to prevent the child from becoming a public charge to the county, township or district in which the mother resides. This is generally accomplished by a provision that the mother, if she be a proper person and is in charge of the child, or, if she be not, then some person who is, be paid certain sums at definite periods. And the amounts paid, the times at which paid, and to whom paid, are all questions to be determined by the court. If this is the inducing cause and sole purpose of the legislative act, there is much reason to call it an exercise of the police power of the state, and the public charge to be guarded against could not occur unless the child was a resident of the state. In any view, the mother is benefited, because, so far as the father is compelled to contribute to the maintenance and education of the child, she is relieved from expense. If she is not in the custody of the child, or is adjudged to be not a proper person to have the custody, yet she is relieved from a legal obligation to the extent that support is given the child by the putative father. Hence, it seems to follow from such a construction that the primary object of a bastardy act is to relieve the public of the charge and support of an illegitimate child, and that the benefits derived by the mother from the enforcement of the law are only incidental. These proceedings do not bar or interfere with her right of personal action against the father for the injuries done her. If that is the primary object of a bastardy act, it can only operate within the boundaries of the state in which it originates. If the child is a non-resident, no municipality of this state could be made chargeable with

its maintenance. This is too plain to require elaboration. The case of *Sutfin v. The People*, 43 Mich. 37, is one strongly in point. It holds that—

"The main purpose of the Michigan bastardy act is to indemnify the public for the support of the child, and it does not apply to cases where the child lives out of the state, even though it was begotten within the state."

The court says:

"The proceedings under this act are purely statutory. They are partly for the benefit of the complainant, and may be instituted in her name, and partly for the purpose of indemnifying the public, and may be instituted in the name of the people. The warrant may be executed in any part of the state, and if upon the trial the defendant is found guilty, he shall be adjudged to be the father of the child, and shall stand chargeable with the maintenance thereof, with the assistance of the mother, in such manner as the court shall order. The person so adjudged to be the father shall give bond to the superintendents of the poor of the county, with sufficient sureties, to the satisfaction of the court, to perform such order, and also to indemnify the county which might be chargeable with the maintenance of such child. The mother and superintendents, respectively, may recover from the defendant any sum of money which ought to have been paid them respectively in pursuance of such order of the court; and the superintendents are given power to compromise and arrange with the father relative to the support of such child, and thereupon to discharge him from all liability for the support of such bastard. It seems very clear, indeed, from these several provisions, that the support of the bastard child, and thereby to prevent its becoming a charge upon the public, is the primary object and purpose of the act. In so far as the putative father is required to contribute to its support, it is a benefit to the mother; but for the performance of such order a bond is given to the superintendents of the poor, and to indemnify the county which might be chargeable with the maintenance of the child. These two things go hand in hand together. Where the mother and child are actual residents of another state, or of a foreign country, it surely could not have been intended that the bond to the superintendents would be for the indemnity of the county where the mother and child resided; nor could it have been intended to meet a contingency that might never happen, by a change

of residence to the county in this state where the proceedings were instituted, or any county into which the parties might come. The statute is designed to meet cases where the child is a resident of this state, and cannot be held applicable to cases like the present. The benefit to the mother of the child which this act contemplates is secondary only. She may have her personal action against the father of the child for her injuries, and the proceedings under this act would be no defense in such an action."

In the case of *Graham v. Monsergh*, 22 Vt. 541, Redfield, J., speaking for the court, says:

"This is a complaint and proceeding under the statute in regard to bastards and bastardy. The important facts admitted on the record are, that the child, which is confessedly not legitimate, was begotten and born out of the state, and the parties never resided in the state, the mother only being temporarily here at the time the proceedings were instituted. The child resided, or was in the keeping of a family which resided, in Derby, in this state, at the time of the trial. The court are well agreed that a proceeding for the purpose of affiliating a bastard child and compelling aid from the father in its support is, in its nature, confined to causes of action accruing within the state. The remedy is a peculiar one, and given and regulated exclusively by statute, and has no fair or reasonable application to causes of action accruing out of the state. And, if we allow a case which accrued in a neighboring state or province to be brought into our courts, we could not exclude such a case coming from Japan, or farther India, or Kamtchatka. Or, if we admit such cases to come into our courts from countries where similar laws exist, we must, equally, from countries where no such laws exist; and, for aught we can perceive, from those countries where polygamy is allowed to the fullest extent. We should thus be liable to become engaged in a species of knight-errantry, in a ludicrous attempt to redress the wrongs and regulate the police of other countries in matters which very little concern us. The truth is, the proceeding is altogether a matter of internal police, and in its very nature as exclusively local as is the administration of criminal justice.

"It is not necessary here to consider how far the case of a woman *bona fide* coming into this state to reside, before the birth of the child, might merit a different consideration. It

is supposable, too, that, should the birth of such a child occur during the temporary absence of the mother from the state, with the continuance of the *animus revertendi*, she might, on her return to the state, be entitled to proceed against the father under these statutes."

This case is expressly affirmed by an opinion of Redfield, C. J., in *Egleson v. Battles*, 26 Vt. 548.

The case of *The State v. Helmer*, 21 Iowa, 370, is one in which an action was commenced on the transcript of a judgment in a bastardy proceeding in the state of Indiana, in Linn county, in the state of Iowa. An exemplified copy of the judgment, duly authenticated, was all the evidence introduced at the trial; there was an objection to the sufficiency of the evidence, and the supreme court of Iowa, by Cole, J., says:

"It is claimed that the subject-matter of the action is one of merely local police regulation in the state of Indiana, under its laws, and that it is not competent for the courts of another state to undertake its enforcement. There is much of truth in the legal proposition upon which this claim rests; but the error is in its application. If the mother of the bastard child, begotten and born in the state of Indiana, has come to Iowa and sought by legal proceedings to compel the defendant, its father, to support it, and to give bond therefor, and otherwise comply with the requirements of the statutes of Indiana, the answer of the defendant, that the subject-matter of such action was one of merely local police regulation of Indiana, not enforceable in this state, would have been conclusive and amount to a complete defense. (*Graham v. Monsergh*, 22 Vt. 543.) Such an action can no more be sustained beyond the limits of the sovereignty within which it arose than can an action for any other penalty provided by statute of such sovereignty for the wrongful act of a defendant therein. Both are alike matters of local, internal police, and enforceable alone by the sovereignty making the regulation and providing the penalty. But where the local jurisdiction has attached, and the courts of that state or sovereignty have properly taken cognizance of the matter, and rendered judgment for such penalty, such judgment is entitled to 'full faith and credit' in every other state."

In the case of *Richardson v. Overseers of Poor*, 33 N. J.

Law, 190, it is held that a bastard child, whose mother before its birth moved out of the state, and who, with her child, has ever since continued to reside in another state, is not chargeable upon any township in this state.  At common law, the duty of supporting the bastard child is upon the mother, and not on the father.  The father cannot be held liable to contribute to its support except as made so by statutory proceedings, and hence it is held by another line of decisions that the principal reason for the existence of the statute is to make the moral obligation of the putative father to support the illegitimate child a legal duty, and this is done for the benefit of the child, and not the mother. (*Carter v. Krise,* 9 Ohio St. 405; *Perkins v. Mabley,* 4 id. 669; *Musser v. Stewart,* 21 id. 356; *Cottrell v. State,* 9 Neb. 125.)

In the case of *Mc'Gary v. Bevington,* 41 Ohio St. 280, the court says:

"The bastardy act of February 2, 1824, (Swan's Statutes, 124,) provided, 'that on complaint made to any justice of the peace in this state by any unmarried woman resident therein,' the justice should issue his warrant for the arrest of the accused.  This statute in terms required that the complainant should be a resident of the state.  Subsequent sections of the statute provided for giving bond to the trustees of the township in which the child was born, conditioned that it shall not become a township charge.  In 1873, (70 Ohio Law, 111,) this statute was so changed as to provide, 'that when any unmarried woman who has been delivered of, or who is pregnant with a bastard child, shall make complaint thereof in writing under oath before a justice of the peace,' the justice shall issue his warrant for the arrest of the accused.  And the second section provided, that when the person accused was arrested and brought before the justice, a compromise might be made by the complainant and the accused, and that when 'the party accused shall pay or secure to be paid to the complainant such sum of money or other property as she may agree to receive in full satisfaction, and shall, further, give bond to the trustees of the township in which such complainant shall reside, conditioned to save such township free from all charges toward the maintainance of said child, the justice shall discharge the party accused out of custody.

"The fourth section of this act preserves the local nature of the proceeding, by the provision that in a certain case the justice may bind the accused in a recognizance to appear at the next term of the court of common pleas in a sum not less than $300 nor more than $600, for the benefit of the township in which such bastard child shall be born, to answer such accusation. The second, third and fourth sections of this act are similar to corresponding sections of the act of 1824. And while the requirement that the complainant shall be a resident of the state is left out of the first section, the local features of the act in other respects remain.

"The Revised Statutes, §§ 5614–5638, have none of the local features of the older statutes. The complaint may be made by an unmarried woman who has been delivered of or who is pregnant with a bastard child. All recognizances for the appearance of the accused party, and all security for the maintenance and support of the child, are required to be given for the benefit of any county, township, or municipal corporation within the state in which such bastard child may become a charge. This radical change of a statute which authorized a proceeding to be commenced only by a resident of the state, and in which many of the objects of the proceeding were for the benefit of the township in which the mother resided, or in which the child was born, into a proceeding without limitation as to residence of the complainant, and in which the remedy provided are for any locality that may become interested in the support of the child, has enlarged its application to any case in which jurisdiction of the defendant or his property may be had within the state. Casting off the limitations that formerly surrounded the proceeding is only following the changes in the statutes.

"Residence in the state, when the cause of action arose, or when proceedings are commenced, is not necessary to maintain any other kind of action or proceeding. In many cases the same action or proceeding may be maintained in any state, depending altogether what the fact is as to the place where the defendant may be summoned or jurisdiction otherwise acquired of the person. If the complainant in bastardy, although the child was begotten and born in another state, and the mother and child still remain residents of such state, can, by coming into this state, get jurisdiction of the defendant under our statute, there is nothing in the statutes, nor in the reason or purpose of the proceeding, to hinder her from maintaining the proceeding here."

In Illinois, in the case of *Kolbe v. The People*, 85 Ill. 336, it is said:

"This is a proceeding under our statute on the subject of bastardy. The child was begotten in Missouri, where the complainant, the putative father, then resided. When near the time of the confinement of the mother, the putative father removed to the state of Illinois. The mother, while pregnant, came into the state of Illinois and into the county where the putative father was found, and instituted the proceedings before a justice of the peace of that county. The case came in regular course before the circuit court, where judgment was rendered against the putative father. He appeals to this court. Appellant insists that the circuit court erred in refusing to dismiss the proceeding for want of bond for costs. The statute requiring bond for costs is not applicable to a proceeding of this kind; and, if it were, the application, not having been made before the justice of the peace, comes too late. The ruling was right.

"A graver question is presented by the objection that the complainant was not a resident of the state of Illinois, and never has been. It is strenuously insisted that this statute was enacted in the interest of the public, and for the protection of the proper county against its liability to the expense of maintaining the child as a pauper.

"The language of the statute is broad, and contains no express limitation of the kind insisted upon. The case is certainly within the letter of the law. The majority of the court do not feel at liberty to hold that the operation of the statute is limited in this respect by such implication. While the statute is in the interest of the public in some respects, still, the main purpose of the statute seems to be to compel the father of a bastard child to bear part of the burden of its support. In this, the mother is chiefly interested.

"We think the proceeding, as it is, was authorized by the statute. The judgment is therefore affirmed."

This case is affirmed in the case of *Mings v. The People*, 111 Ill. 98.

In *Hauskins v. The People*, 82 Ill. 193, the court declares that—

"The foundation of the action is not to punish the defendant for an immoral or an unlawful act, but to compel a father to contribute to the support of his offspring. If the sole ob-

ject of the act is to compel a father to support his illegitimate child, it must be that the action is transitory, and not local, and that it could be maintained in any jurisdiction within which the putative father can be found."

The case of *Duffies v. The State*, 7 Wis. 672, proceeds upon a theory somewhat different from the other cases before cited. The court says:

"This was a complaint and proceeding instituted under chapter 31 of the Revised Statutes in regard to the support of bastards. The testimony in the case showed that the child was begotten in the town of Dover, in the county of Racine, and that the mother went to Illinois, and was residing in Bloomingdale, in that state, at the birth of the child, and continued to reside there until the child was two years old, when she returned to this state, and instituted this proceeding for the purpose of affiliating a bastard child, and compelling the father to aid in its support. It is now insisted by the counsel for the plaintiff in error, that the settlement of the child is in Illinois, and that this proceeding will not apply to a case when the mother was residing in another state at the time of the birth of the child. In support of this position, we have been referred to the cases of *Graham v. Monsergh*, 22 Vt. 543; *Egleson v. Battles*, 26 id. 548.

"The obligation of the father to support a bastard child grows out of the paternal relations existing between him and such child; and we therefore deem it quite immaterial, so far as his obligation and duty are concerned, whether the child is born out of the state or not. The object of the statute is to save the public from the burden of supporting illegitimate children by compelling the father to provide for their main-tenance. It is the father's duty to support his children, legit-imate or illegitimate, and because he is likely to neglect it in the latter case, the law enforces the obligation by proceedings under bastardy acts. This is the ground upon which these statutes are founded. What difference can it make to any county or town in this state, which is about to be burdened with the support of an illegitimate pauper child, whether the child was begotten and born in such county or town or in England or Germany? If the father is within the state, where he can be held amenable to our laws, and in a town or county where the child is likely to become a charge, it is right and proper that he should support his own offspring, and the

law will compel him to do so.   The accident of the birthplace
of such child ought not to be permitted to affect this general
universal obligation growing out of the paternal relation.   We
are therefore unable to concur in the reasoning of the courts
in Vermont, where it has been held that a bastard child, born
out of the state, its mother at the time having no domicile in
the state, cannot be affiliated, or its maintenance charged upon
the father under the bastardy act."

It seems to us, from a careful reading and comparison of
these various decisions, that they are greatly controlled by the
views of the different courts as to the main object and purposes
of their various statutes.   The courts that hold that the prin-
cipal object of the statute is to prevent illegitimate children
from becoming a charge say that the proceedings are local;
while the other courts that hold the purpose of the statute to
be to convert the moral obligation into a legal duty say they
are transitory.   When the question is historically examined,
it will be found that originally the overseers of the poor were
alone empowered to commence and maintain such proceedings.
But the universal tendency has been in all this legislation
everywhere to gradually give to the mother the sole power
to institute these proceedings, and the practical result of such
a tendency is to accomplish all the purposes contemplated.
The enforcement of the statute by the mother both protects
the municipality from the burden and makes the putative
father contribute material aid to the mother in the mainte-
nance and education of their illicit offspring.   Our legislation
has partaken very largely of this tendency.   It seems that
such proceedings can be instituted alone on the complaint of
the mother.   The money is to be paid to her, unless it appears
that she is an improper person.   She can at any time dismiss
the suit, if she enters of record an admission that provision
has been made for the maintenance of the child to her satis-
faction.   Such an entry is a bar to all other prosecutions for
the same cause and purpose.   Sections 19 and 21 of the act
seem to be conclusive against the view that the sole purpose
of the proceeding is to protect the public, for it provides that

"in case of the death of the putative father of such child, the right of action shall survive against his personal representatives, and the death of the bastard child shall not cause the abatement of the proceedings." If the sole or principal object of the statute is to protect the public from the maintenance of the child, the proceedings would abate with the death, for with the death the necessity for the statute would cease to exist. Very strong support of this view is found in the act repealed by the statute we are now considering. The act repealed (chapter 109, Laws of 1859) provided, that on complaint of any woman, resident in this territory, the putative father of a bastard child could be arrested, and if the accused would pay, or secure to be paid, to the woman such a sum of money as she would agree to receive in satisfaction, and would give bond to the trustee of the township in which said complainant shall reside, conditioned to save such township free from all charges for the maintenance of the child, then the accused shall be discharged. Another section provides, that if the woman neglects to bring a suit for the maintenance of the child, or commences a suit and fails to prosecute it to final judgment, the township trustees may bring such a suit. Under the act now in force, the unmarried woman, who is now alone empowered to commence proceedings, is not required to be a resident; neither does the act authorize any county or township interference with the proceedings at any stage, but gives the mother the sole right to institute, control and dismiss the action.

We are forced to the conclusion, that if the putative father of a bastard child is a resident of this state, the mother can institute proceedings against him under our statute, even if the mother and child are residents of any other state.

We recommend that the judgment of the district court be affirmed.

By the Court: It is so ordered.

All the Justices concurring.